UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| LOUISIANA HEALTH SERVICE INDEMNITY COMPANY D/B/A BLUECROSS/BLUESHIELD OF LOUISIANA<br><br>　　　　　　　　Plaintiff,<br><br>　　　v.<br><br>BOEHRINGER INGELHEIM PHARMA Gmbh & CO. KG; BOEHRINGER INGELHEIM INTERNATIONAL Gmbh; BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.; TEVA PHARMACEUTICALS USA, INC.,; TEVA PHARMACEUTICALS INDUSTRIES LIMITED; BARR PHARMACEUTICALS INC.; BARR LABORATORIES, INC.; DURAMED PHARMACEUTICALS, INC; DURAMED PHARMACEUTICALS SALES CORP.; | CASE NO: 15-964<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Louisiana Health Service Indemnity Company d/b/a Bluecross/Blueshield of Louisiana ("BCBSLA") files this Complaint against defendants Boehringer Ingelheim Pharma GmbH & Co. KG, Boehringer Ingelheim International GmbH, Boehringer Ingelheim Pharmaceuticals, Inc. ("Boehringer"), Teva Pharmaceuticals USA, Inc., Teva Pharmaceuticals Industries Limited ("Teva"), Barr Pharmaceuticals Inc., Barr Laboratories, Inc. ("Barr"), Duramed Pharmaceuticals Inc., and Duramed Pharmaceuticals Sales Corp. ("Duramed"), (together, the "Defendants") and alleges as follows based on (a) personal knowledge; (b) the investigation of counsel; and (c) information and belief.

## I.　NATURE OF THE ACTION

1.　This civil action seeks treble damages, restitution, disgorgement, declaratory judgment, injunctive and other relief arising out of Defendants' unlawful agreements to

allocate the market for 25 mg aspirin/200 mg extended-release dipyridamole capsules, which is sold by Boehringer under the brand name Aggrenox. Aggrenox is a combination antiplatelet agent used to reduce the risk of stroke in patients who have already suffered a "mini-stroke" (or transient ischemic attack) or a completed ischemic stroke due to thrombosis (*i.e.*, blood clot). Boehringer received approval to manufacture, market and sell Aggrenox in the United States from the United States Food and Drug Administration ("FDA") in 1999.

2.      Defendants have entered into an unlawful "reverse payment agreement" through which Boehringer paid Barr more than $120 million in cash and other valuable consideration in exchange for Barr's agreement not to launch a less expensive, bio-equivalent generic version of Aggrenox for up to seven years. No bio-equivalent generic version of Aggrenox is presently on the market and no generic will come to market until July 2015 as a direct and proximate result of Defendants unlawful market allocation agreement.   This agreement not to compete has prevented less expensive generic versions of Aggrenox from entering the market, causing BCBSLA to pay a substantially higher price for Aggrenox than it otherwise would. Since 1999, Boehringer has charged supracompetitive prices and reaped a steady source of profits from Aggrenox, with annual sales reaching approximately $400 million.

3.      On February 1, 2007, Barr sought regulatory approval to manufacture, market and sell a generic version of Aggrenox before the expiration of any patents associated with Aggrenox by filing an Abbreviated New Drug Application ("ANDA") with the FDA.  As the first filer of a substantially complete generic Aggrenox ANDA, Barr may be entitled to 180 days of market exclusivity during which it is free from competition from other Aggrenox

generics – with the exception of an authorized generic marketed by the brand company, Boehringer.

4.     Boehringer sued Barr, alleging that Barr's generic Aggrenox product would infringe Boehringer's U.S. Patent No. 6,015,577 (the "'577 Patent")—even though the '577 Patent was invalid and/or unenforceable and thus unlikely to prevent any generic Aggrenox product from coming to market in advance of patent expiration in January 2017.  Boehringer sued Barr solely to obtain an automatic stay under the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984) ("Hatch-Waxman Act") which prevented the FDA from approving Barr's generic Aggrenox product for up to thirty months.

5.     Though temporarily stalled on account of the 30-month stay, Boehringer faced imminent competition from Barr other generic manufacturers due to the weakness of its '577 Patent, beginning either upon a ruling of patent invalidity or unenforceability, or at the latest upon the end of the FDA issued stay.

6.     As a sophisticated pharmaceutical manufacturer, Boehringer was well aware that generic versions of brand drugs are typically priced significantly below brand versions. Because of the price differentials, and other institutional features of the pharmaceutical industry, generic versions are liberally and substantially substituted for their brand counterparts.  As a result, Boehringer knew that the entry of one or more generic versions of Aggrenox would cause a drastic loss of its Aggrenox monopoly profits.

7.     To eliminate the risk that generic entry would devastate Aggrenox profits and to ensure its monopoly, Boehringer elected to share its monopoly profits with Barr in exchange for Barr's promise to drop its challenge to the '577 Patent and stay out of the

market with a less expensive, bioequivalent generic version of Aggrenox for approximately seven years. More specifically, on or about August 11, 2008, Boehringer and Barr entered a non-competition agreement (the "Exclusion Payment Agreement" or "Agreement").

8.     Under this Agreement, Boehringer agreed to pay Barr in exchange for Barr's commitment to delay marketing generic Aggrenox until as late as July 1, 2015. Boehringer's payment took two forms: (a) cash payments provided under the guise of a co-promotion agreement – an estimated $120 million in one-time and yearly royalty payments – that far exceed the fair value of the services provided by Barr; and (b) an agreement not to compete against Barr's generic Aggrenox product with Boehringer's own generic Aggrenox product once generic entry belatedly occurs.

9.     As a result of the Agreement, including the large unjustified payments from Boehringer to Barr provided for therein, Barr (and its successor Teva) has, in fact, delayed marketing less expensive generic Aggrenox, and continues to do so, despite having final FDA approval to market generic Aggrenox since August 2008. And once generic entry finally occurs, BCBS will still be paying artificially inflated prices because the Agreement eliminates inter-generic competition between Boehringer and Barr. The purpose and effect of Boehringer's payments to Barr was to restrain competition in the market for Aggrenox and its AB-rated generic equivalents from the time of possible generic entry through the expiration of the '577 Patent.

10.    But for the Agreement, less expensive, generic versions of Aggrenox would have been available to BCBSLA as early as August 2008. Had Boehringer not paid Barr to drop its challenge to the '577 Patent and stay out of the market, Barr would have already launched its less expensive generic Aggrenox: (a) "at-risk" (*i.e.*, while the patent litigation

was pending); (b) upon winning the patent litigation; or (c) pursuant to a lawful settlement agreement without a large unjustified payment from Boehringer to Barr.  Absent the Agreement, immediately upon Barr's launch, Boehringer, as a rational economic actor seeking to recoup lost branded sales, would have launched an authorized generic Aggrenox in competition with Barr, driving down prices even further.

11.    The Agreement has caused and is causing BCBSLA to pay substantially more for 25 mg aspirin/200mg extended-release dipyridamole capsules than they would have absent Defendants' anti-competitive conduct. Defendants have shared in the illicit profits that have resulted from the artificially-inflated prices BCBSLA paid for Aggrenox.

12.    Defendants' Exclusion Payment Agreement was designed to and did in fact: (a) delay the entry of less expensive generic versions of Aggrenox; (b) fix, raise, maintain or stabilize the price of 25 mg aspirin/200 mg extended-release dipyridamole capsules; and (c) allocate 100% of the market for 25 mg aspirin/200 mg extended-release dipyridamole capsules to Boehringer for up to seven years.  Moreover, once generic Aggrenox entry finally occurs, the Agreement is designed to and will allocate 100% of the generic segment to Barr during the 180-day exclusivity period (July 2015 to January 2016) and reduce inter-generic competition for the remainder of the 577 Patent's term.

13.    BCBSLA brings this action on its own behalf with respect to its indirect purchases, payments and/or reimbursements for Aggrenox, other than for resale, since August 14, 2008.  BCBSLA seeks a judgment declaring that the Exclusion Payment Agreement is unlawful under Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1, 2. BCBSLA also seeks an injunction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, because, unless enjoined, the Defendants' unlawful conduct will continue unchecked and

5

BCBSLA will continue to suffer financial harm as a result of Defendants' antitrust violations. BCBSLA also asserts claims for compensatory and treble damages, restitution of overpayments made by BCBSLA, disgorgement from the Defendants of monies they made that are attributable to BCBSLA's overpayments, and other equitable relief for continuing violations of state antitrust, consumer protection and unjust enrichment laws.

## II.     **JURISDICTION AND VENUE**

14.     This Court has jurisdiction over this matter under 15 U.S.C. § 26 and 28 U.S.C. §§ 1331 and 1337 because BCBSLA brings claims under section 16 of the Clayton Act, 15 U.S.C. § 26, for injunctive and equitable relief to remedy the Defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. The Court has supplemental jurisdiction over BCBSLA's pendent state law claims pursuant to 28 U.S.C. § 1367.

15.     This Court has jurisdiction over Defendants because they are present in the United States, do business in the United States (including specifically the illegal acts complained of by BCBSLA which occurred in the United States and were intended to and do restrain commerce throughout the United States), have registered agents in the United States, may be found in the United States, and are otherwise subject to the service of process provisions of 15 U.S.C. § 22.

16.     Venue is appropriate within this district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §1391(b) and (c), because Defendants transact business within this district and because their interstate trade and commerce is carried out in substantial part in this district. In addition, one of the Defendants is headquartered in this district and several related actions have already been transferred to this division by the Judicial Panel on Multidistrict Litigation.

III.  **PARTIES**

A.    **Plaintiffs**

17.    Plaintiff Louisiana Health Service Indemnity Company d/b/a Bluecross Blueshield of Louisiana ("BCBSLA") is a domestic health insurance corporation licensed to conduct business in the State of Louisiana. Plaintiff BCBSLA indirectly purchased, paid and/or provided reimbursement for Aggrenox during the Relevant Period[1] and paid more than it would have absent Defendants' unlawful scheme to prevent generic entry. Plaintiff BCBSLA purchased and/or paid for Aggrenox in the following states during the Relevant Period: Alaska, Alabama, Arkansas, Arizona, California, Colorado, Florida, Georgia, Illinois, Kansas, Kentucky, Louisiana, Massachusetts, Maine, Michigan, Minnesota, Mississippi, Missouri, North Carolina, New York, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, Tennessee, Texas, Utah, Virginia, and Washington.

B.    **Defendants**

18.    Defendant Teva USA, Inc. is a Delaware corporation with its principal place of business at 1090 Horsham Road, P.O. Box 1090, North Wales, Pennsylvania 19454. Teva USA is a subsidiary of Teva Pharmaceutical Industries, Ltd., a corporation organized and existing under the laws of Israel ("Teva Israel"). Teva USA is the largest generic drug company by sales volume in the United States.

19.    Defendant Teva Pharmaceuticals Industries Limited is a corporation organized and existing under the laws of Israel, with its principal place of business at 5 Basel Street, P.O. Box 3190, Petach Tikva, Israel.  Teva is a leading manufacturer of generic drugs, and is one of the largest sellers of generic drugs in the United States.  Teva purchased Barr

---

[1] The "Relevant Period" is herein defined as beginning on August 14, 2008, extending to the present, and continuing until such time as the effects of the defendants' anticompetitive conduct ceases, *i.e.*, until such time after generic Aggrenox becomes available and the tail period of anticompetitive market effects subsides completely.

Pharmaceuticals Inc. on December 23, 2008.

20.     Defendant Barr Pharmaceuticals Inc. (n/k/a Barr Pharmaceuticals, LLC) is a limited liability company organized under the laws of the state of Delaware, with its principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey.

21.     Defendant Barr Laboratories, Inc. is a corporation organized under the laws of the state of Delaware, with its principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey.

22.     On December 23, 2008, Barr became a wholly-owned subsidiary of Teva.

23.     Defendant Duramed Pharmaceuticals Inc. is a corporation organized under the laws of the state of Delaware, with its principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey.  Until 2008, Duramed was a subsidiary of Barr.  In December 2008, when Teva purchased Barr, Duramed became a subsidiary of Teva and is now known as Teva Women's Health Inc.

24.     Defendant Duramed Pharmaceuticals Sales Corp. is a corporation organized under the laws of the state of Delaware, with a principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey.  It was a subsidiary of Barr until December 2008, when it became a subsidiary of Teva.

25.     Defendant Boehringer Ingelheim Pharma GmbH & Co. KG is a limited partnership organized and existing under the laws of Germany, with its principal place of business at Binger Strasse 173, 55216 Ingelheim, Germany.

26.     Defendant Boehringer Ingelheim International GmbH is a limited liability company organized and existing under the laws of Germany, having a principal place of business at Binger Strasse 173, 55216 Ingelheim, Germany.

27.     Defendant Boehringer Ingelheim Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business at 900 Ridgebury Road, Ridgefield, Connecticut.

28.     All of the Defendants' actions described in this complaint are part of, and were in furtherance of, the illegal restraint of trade alleged herein, and were authorized, ordered, and performed by the Defendants' various officers, agents, employees, or other representatives while actively engaged in the management of the Defendants' affairs, within the course and scope of their duties and employment, and with the actual, apparent or ostensible authority of the Defendants.

## IV.     REGULATORY BACKGROUND

### A.     Generic Drugs Benefit Purchasers

29.     Generic competition allows purchasers at all levels of the pharmaceutical supply chain to purchase both the brand name drug and its generic equivalents at a reduced price.  Generic competition to a single branded drug can provide billions of dollars in savings to consumers, insurers, pharmacies, and other drug purchasers.

30.     Generics that meet all of the requirements for approval are assigned an "AB" rating by the FDA.  The AB rating permits the generic drug to be substituted for the brand name drug at the pharmacy counter.  All states permit, and some states require, pharmacists to automatically substitute an AB-rated generic drug for the corresponding brand name drug unless the doctor has said that the prescription for the brand name product must be dispensed as written.

31.     Until a generic manufacturer enters the market, the brand name manufacturer maintains a pure monopoly, and can charge monopoly prices without a material loss in sales

volume because the drug faces no competition.  It is widely acknowledged that a monopolist's profit maximizing price exceeds the price that would prevail in a competitive market. With respect to the market for branded pharmaceutical drugs and their AB-rated generic equivalents, the monopoly price is typically far in excess of the competitive price. Brand name drug manufacturers therefore have a strong interest in seeking to restrain generic competition.

32.    Many third-party payors (such as health insurance plans and Medicaid programs) have adopted policies to encourage the substitution of AB-rated generic drugs for their branded counterparts.  And many consumers routinely switch from a branded drug to an AB-rated generic drug once the generic becomes available.  AB-rated generic drugs therefore capture a significant share of their branded counterparts' sales, causing a significant reduction in the branded drug's unit and dollar sales.

33.    The first AB-rated generic drug is typically priced significantly below its branded counterpart.  As more AB-rated generics enter the market, the brand and generic drug prices usually continue to decline as the generics compete with one another and the brand name drug.

34.    The first generic equivalent to reach the market often captures 80% or more of the market within the first six months.  Within one year of market entry, the generic often accounts for 90% of the branded drug's unit sales and sells for 15% of the price of the brand name drug.

**B.    The FDA Approval Process**

35.    Under the Federal Food, Drug, and Cosmetic Act (the "FDCA"), manufacturers who seek to market a new drug must apply for FDA approval to sell the drug

by filing a New Drug Application, or NDA. 21 U.S.C. §§ 301-392. NDAs must include specific data concerning the safety and effectiveness of the drug and identify applicable patents. *Id.* at §§ 355(a) & (b).

36.     When the FDA approves a brand manufacturer's NDA, the brand name manufacturer lists any patents it contends apply to the approved drug in a publication called the "Approved Drug Products with Therapeutic Equivalence Evaluations," commonly known as the "Orange Book." 21 U.S.C. §355(j)(7)(A)(iii). The FDA performs a ministerial duty in listing these patents, and does not confirm the accuracy of the information supplied by the brand manufacturer. After the NDA is approved, the brand manufacturer may list additional patents relating to the drug in the Orange Book.

### C.     The Government Encourages and Facilitates the Approval of Generic Drugs Through the Hatch-Waxman Amendments

37.     In 1984, Congress amended the FDCA with the enactment of the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984), known as the Hatch-Waxman Amendments.

38.     The Hatch-Waxman Amendments simplify the regulatory hurdles that generic manufacturers have to clear to enter the market. Instead of filing a lengthy and costly NDA, the Hatch-Waxman Amendments allow generic manufacturers to seek FDA approval on an expedited basis by filing an Abbreviated New Drug Application, or ANDA.

39.     If an ANDA applicant shows that the generic drug is "bioequivalent" to the brand name drug—that it contains the same active ingredient(s), dosage form, route of administration, and strength as the brand name drug—then the ANDA may rely on the scientific safety and effectiveness findings included in the brand name drug manufacturer's original NDA. 21 U.S.C. § 355(j)(2)(A). The FDA must approve an ANDA unless the

11

information submitted in the ANDA is insufficient to meet the Act's requirements. 21 U.S.C. § 355((j)(4). The streamlined approval process under the Hatch-Waxman Amendments makes it easier for manufacturers to bring competing generic products to the market.

40.     While Hatch-Waxman seeks to facilitate generic competition, the brand name manufacturer retains the right to enforce any patents associated with the drug. To gain regulatory approval, an ANDA application must also certify that the generic drug will not infringe the brand name drug's patents listed in the Orange Book, because either: (i) no patents exist on the brand name product; (ii) the patents have expired; (iii) the patents will expire by the time the generic product comes to market; or (iv) the patents are invalid or will not be infringed by the sale of the generic product. See 21 U.S.C. § 355(j)(2)(A)(vii)(I-IV). The last certification, that the patents are invalid or not infringed, is known as a "Paragraph IV certification."

41.     When a generic manufacturer files a Paragraph IV certification asserting that a patent listed in the Orange Book is invalid or will not be infringed, it must promptly give notice of its certification to both the brand manufacturer and the owner of the patent. If the brand manufacturer files a patent infringement lawsuit against the ANDA filer within 45 days of receiving the Paragraph IV certification, the FDA may not grant final approval to the ANDA until the earlier of (a) 30 months or (b) a court ruling that the patent is invalid or not infringed by the generic manufacturer's ANDA. 21 U.S.C. §355(j)(5)(B)(iii). During the 30-month stay, the FDA may grant "tentative approval" to an ANDA applicant if the FDA determines that the ANDA would otherwise qualify for final approval, but cannot authorize the generic manufacturer to market its drug before the 30-month stay expires or a court rules

on invalidity and infringement.

42.     Congress also created incentives for drug manufacturers to seek approval of generic alternatives to branded drugs and challenge weak patents.   The Hatch-Waxman Amendments grant a 180-day period of market exclusivity to the first ANDA applicant to file a substantially complete ANDA containing a Paragraph IV certification.   During the 180-day exclusivity period the first filer enjoys temporary freedom from competition from other generic versions of the drug, and is able to sell the generic for a higher price than when multiple generics enter the market. The brand name manufacturer may, however, market its own generic equivalent of the brand name drug (known as an "authorized generic") during the 180-day period.

43.     The first-filed generic manufacturer can forfeit its right to the 180-day period of exclusivity.   This can occur, for example, if the first-filer fails market its product under certain circumstances or fails to receive tentative approval of its ANDA from the FDA within 30 months of filing the ANDA, unless the failure is caused by a change in or review of the requirements for approval of the ANDA.

**D.     Pharmaceutical Manufacturers Game the Regulatory Structure**

44.     Because the Hatch-Waxman regulatory scheme automatically delays approval of an ANDA whenever a brand name manufacturer sues the potential generic competitor for patent infringement, brand name manufacturers frequently take aggressive positions in listing patents in the Orange Book, and then bring patent lawsuits against any generic competitor that files an ANDA with a Paragraph IV certification.   Brand name manufacturers often sue generics simply to delay generic competition, rather than to enforce valid patents against infringing products.

45.     In connection with the resolution of patent litigation arising out of Paragraph IV Certifications, brand name manufacturers have also developed a practice of entering into "settlements" in which brand name manufacturer pays off its generic competitors in exchange for a delay in generic competition.  These exclusion payment agreements among horizontal competitors not to compete are commonly known as "pay-for-delay" or "reverse payment agreements." Brand and generic manufacturers execute exclusion payment agreements as purported settlements of patent infringement lawsuits that brand manufacturers file against generic manufacturers.  The brand name manufacturer preserves increased profits by keeping its monopoly intact via a payment of some of the monopoly profits to the generic manufacturer, which in turn agrees to delay marketing its product.  Initially these agreements took the form of a straight cash payment from the brand name manufacturer to the generic competitor.  As a result of regulatory scrutiny, congressional investigations, and class action lawsuits, brand name manufacturers and generic competitors have entered into increasingly elaborate agreements in an attempt to mask the fundamentally anticompetitive character of their agreements.  Because the profits to be gained by delaying generic competition are so great, however, drug manufacturers retain the incentive to enter into such agreements.

46.     The first generic filer's agreement to delay marketing its drug may also prevent other manufacturers of generics from bringing their own products to market.  If the first-filed generic manufacturer is eligible for 180-days of marketing exclusivity, no other generic manufacturer can enter the market until the end of the exclusivity period.  This "bottlenecking" tactic is known as exclusivity "parking."

14

E.      **Agreements Not to Compete Between the Brand's Authorized Generic and the First-Filing Generic's Product**

47.     The 180-day marketing exclusivity to which first-filer generics may be entitled does not prevent a brand manufacturer from marketing its own generic alternative to the brand drug during that 180-day period.  Such an authorized generic is chemically identical to the brand drug, but is sold as a generic product through either the brand manufacturer's subsidiary (if it has one) or through a third-party generic manufacturer. Boehringer has traditionally marketed its authorized generic products in-house, through its wholly-owned subsidiary Roxane Laboratories, Inc.  Competition from an authorized generic during the 180-day exclusivity period substantially reduces the first-filer's revenue, and substantially reduces drug prices for consumers.

48.     In its recent study, Authorized Generic Drugs: Short-Term Effects and Long-Term Impact (August 2011) (the "FTC Study"), the Federal Trade Commission ("FTC") found that authorized generics capture a significant portion of sales, reducing the first-filer generic's revenues by approximately 50% on average during the 180-day exclusivity period. The first-filing generic makes significantly less money when it faces competition from an authorized generic because: (a) the authorized generic takes a large share of unit sales away from the first filer; and (b) the presence of an additional generic in the market causes prices to decrease.

49.     Although first-filing generic manufacturers make significantly less money when they must compete with an authorized generic during the first 180 days, consumers and other drug purchasers such as BCBSLA benefit from the lower prices caused by competition between the authorized generic and the first-filing generic.

50.     Given the significant negative effect of an authorized generic on the first-

filing generic's revenues, a brand manufacturer's agreement not to launch an authorized generic has tremendous value to the generic manufacturer. Brand manufacturers have used such agreements as a way to pay the first-filer to delay entering the market. Such non-competition agreements deprive consumers and other drug purchasers such as BCBSLA of the lower prices resulting from two forms of competition: (a) among the branded and the generic products; and (b) between the generic products.

51. Agreements not to compete with an authorized generic can take many forms. According to the FTC Study, one such form includes agreements like the Agreement here whereby the brand manufacturer agrees to exclusively supply the first-filing generic with the authorized generic product. As confirmed by the FTC, the result is the same as if the brand agreed not to launch any authorized generic: no competition between an authorized generic and the first-filing generic's product for a period of time. *See* FTC Study at 146.

## V.   FACTS

### A.   Boehringer Starts Marketing Aggrenox in December 1999

52. Boehringer developed Aggrenox as a treatment to lower the risk of stroke in people who have had a transient ischemic attack (also known as a 'mini stroke') or stroke due to a blood clot. A transient ischemic attack is similar to a stroke, except it usually lasts only a few minutes and does not result in permanent damage. Aggrenox is a single gelatin capsule containing 200mg of extended-release dipyridamole and 25mg of immediate-release acetylsalicylic acid (aspirin). Boehringer has previously marketed dipyridamole as a stand-alone drug under the brand name Persantine to prevent clots from forming after heart valve replacements and aspirin has previously been prescribed for the prevention of strokes. Other drugs prescribed for the prevention of strokes are not AB-rated to Aggrenox, cannot be

automatically substituted for Aggrenox by pharmacists, do not exhibit substantial cross-price elasticity of demand with respect to Aggrenox at competitive prices, and thus are not economic substitutes for, nor reasonably interchangeable with, Aggrenox.

53.     On December 15, 1998, Boehringer filed NDA 20-884 seeking FDA approval to market Aggrenox to help reduce the risk of repeated strokes.  The FDA approved the NDA on November 22, 1999.

54.     In connection with its Aggrenox NDA, Boehringer submitted Patent No. 6,015,577 (the '577 Patent) to the FDA for listing in the Orange Book.  The purported invention described in the '577 Patent is a composition of dipyridamole and acetylsalicylic acid for oral administration.  The '577 Patent is scheduled to expire on January 18, 2017.

55.     Boehringer began marketing Aggrenox in December 1999.  Aggrenox was the only prescription drug for reducing the risk of subsequent stroke through a single aspirin and extended-release dipyridamole capsule.  Boehrigner represented that studies submitted to the FDA by Boehringer showed that Aggrenox's combined dipyridamole-aspirin formulation is more effective at reducing the risk of future stroke than administration of either ingredient on its own.

56.     However, as described in Aggrenox's FDA-approved labeling, because Aggrenox contains aspirin, Aggrenox can cause fetal harm when administered to a pregnant or nursing woman.  Boehringer states on its Aggrenox website that "Aggrenox should be avoided during pregnancy, especially in the third trimester."

57.     Aggrenox quickly became a steady source of profits for Boehringer. By 2008 Aggrenox sales in the United States had reached $366 million.

**B.    Barr Seeks FDA Approval to Market a Generic Equivalent to Aggrenox**

58.    On February 1, 2007, Barr submitted ANDA 78-804 to the FDA, seeking approval to manufacture, market and sell a generic, bioequivalent version of Aggrenox.  Barr was the first manufacturer to submit a substantially complete ANDA for generic Aggrenox with a Paragraph IV certification for the '577 Patent. As the first-filing generic, Barr may receive 180-days of marketing exclusivity, free from other ANDA-based generic Aggrenox competition.

59.    On May 31, 2007, Barr notified Boehringer that it had submitted ANDA 78-804 with a Paragraph IV certification regarding the '577 Patent, asserting that its generic would not infringe the patent and/or that the patents was invalid or unenforceable.

60.    On July 11, 2007, Boehringer sued Barr for patent infringement in the United States District Court for the District of Delaware, alleging that Barr's filing of its ANDA infringed the '577 patent.  Boehringer's lawsuit triggered an automatic 30-month stay that prohibited the FDA from granting final approval of Barr's ANDA until the stay expired in November 2009.

61.    Barr denied the allegations in Boehringer's complaint, and counterclaimed for declaratory relief of non-infringement, invalidity, and unenforceability of the '577 Patent. Barr argued that Boehringer had misrepresented to the United States Patent and Trademark Office the nature and materiality of a prior patent, Patent No. 5,694,024, and its related reference DE-A1-3,515,874.  According to Barr, the properly disclosed patent and reference would have made the claims of the '577 Patent obvious.  In light of these allegations, Barr asked the District Court to find the '577 Patent unenforceable.

62.    The patent lawsuit continued until August 2008 without any substantive

rulings.  Barr's defenses and counterclaims, however, were strong.  Absent a settlement, the '577 Patent was likely to have been adjudicated invalid, unenforceable, and/or not infringed.

**C.    Boehringer and Barr Enter Into the Exclusion Payment Agreement**

63.    On August 11, 2008 Boehringer and Barr announced that they had settled the patent litigation and on or about that same time, Boehringer and Barr entered the Exclusion Payment Agreement.

64.    Under the terms of the Agreement, Boehringer and Barr agreed that Barr would drop its challenges to the '577 Patent, delay launching a generic equivalent of Aggrenox until as late as July 1, 2015, and act to preserve its 180-day exclusivity, in order to block other generic manufacturers from entering the market before Barr's delayed entry.  A generic launch date as late as July 2015 would effectively preserve 82% of the patent's remaining life – for which Boehringer was prepared to, and did, pay Barr handsomely.

65.    As the *quid pro quo* for Barr's agreement to drop its challenge to the '577 Patent  and stay out of the market for almost seven years, Boehringer agreed to make cash payments to Barr estimated at $120 million dollars and to pay other valuable consideration that was as good as cash to Barr. Boehringer's payments to Barr under the Agreement took at least two forms.

66.    *First*, Boehringer agreed to pay Barr (through its subsidiary Duramed, now known as Teva Women's Health) under the guise of co-promotion services related to Aggrenox.    For ostensibly promoting anti-stroke drug Aggrenox to obstetricians, gynecologists, and women's health care professionals from April 2009 and continuing until generic entry, Boehringer agreed to pay Barr millions in cash upfront plus substantial additional consideration, including annual, increasing royalties on the total U.S. Aggrenox

19

sales.  The total value of these payments is an estimated $120 million and counting.

67.     In litigation with the FTC regarding the agency's investigation of the Agreements, Boehringer's counsel admitted that the co-promotion agreement was not a stand alone business transaction, but rather the means by which Boehringer paid, and continues to pay, Barr to drop its patent challenge and stay out of the market. For example, Boehringer's counsel described the co-promotion arrangement as "part and parcel of the settlement.  It was part of the flow of compensation.  It was part of the considerations of the settlement, so it is really a mischaracterization or misdescription to say that we said it was stand alone." *Federal Trade Commission v. Boehringer Ingelheim Pharmaceuticals, Inc*., No. 1:09-mc-00564-JMF (D.D.C.), Docket No. 59, Hearing Transcript at 37:9-13.

68.     At other points during litigation with the FTC, Boehringer's counsel similarly explained that Boehringer's continuing payments to Barr for ostensibly co-promoting Aggrenox were consideration under the settlement and that the parties would not have entered the co-promotion agreement and/or would not have agreed to the price and/or other terms that they did absent Barr's agreement to delay entry into the market with generic Aggrenox:

69.     The settlement agreement and co-promotion agreement "were executed together. The evidence is replete that [the co-promotion agreement was] part of the settlement." (Id. at 18:16-18);

70.     We have always said that the Aggrenox co-promote was part of the settlement.  It had – It absolutely was." (*Id.* at 36:19-21);

71.     The co-promote arrangement was "inextricably intertwined with settlement negotiations" (*Federal Trade Commission v. Boehringer Ingelheim Pharmaceuticals, Inc.*,

No. 12-5393 (D.C. Cir.), Brief of Respondent-Appellee Boehringer Ingelheim
Pharmaceuticals, Inc., at p. 42); and

72. But for the settlement, "parties engaged in contentious litigation would not
otherwise be willing to do business with each other. . . ." (*Id.*).

73. Moreover, the face of the Agreement itself makes explicitly clear that the co-
promotion arrangement and settlement form one Agreement, not independent business
transactions.

74. Boeheringer's continuing payments to Barr under the Co-Promotion
Agreement vastly exceed the fair value of the services provided by Barr and its subsidiaries.
Boehringer had no expectation of receiving significant financial benefit during the seven-
year delay period from Barr's promotion of a drug for patients who have suffered strokes to a
target group consisting primarily of gynecologists and obstetricians.  Indeed, Boehringer
compensates Barr for ostensibly promoting Aggrenox to obstetricians even though
Boehringer warns pregnant and nursing women and the doctors treating them not to take or
prescribe Aggrenox because it poses a serious risk to fetal health.

75. Moreover, Boehringer's payments to Barr under the Agreement are based on a
percentage of total U.S. sales, not just on the far smaller percentage of sales resulting from
Barr's promotion of anti-stroke drug Aggrenox to obstetricians, gynecologists, and women's
health care professionals, as one would expect with a fair value for services promotion
agreement.  Thus, the vast majority of Boehringer's multi-million dollar payments to Barr
could have nothing whatsoever to do with any services purportedly performed by Barr.
Boehringer's payments to Barr were purely for delay.

76. According to Boehringer's own counsel, documents related to the co-

promotion agreement "provide a blueprint for how a company can extract settlement payments out of not only our client, but virtually every branded pharmaceutical company."

77.     *Second*, the Agreement provides that Boehinger and Barr will not compete with respect to generic Aggrenox once a generic Aggrenox product finally enters the market. Under the Agreement, Boehringer agreed to exclusively supply Barr with Boehringer's own authorized generic Aggrenox product at below-market rates, and not to supply any third-party with Boehringer's authorized generic product, until the expiration of the '577 Patent. In return, Barr agreed not to launch its own ANDA generic product (for which it received final FDA approval in August 2009) until the expiration of the '577 Patent.

78.     The purpose and effect of these covenants is (a) no competition between a Boehringer authorized generic product and Barr's ANDA generic product for approximately one and a half years (from generic entry on July 1, 2015 to the end of the patent term on January 18, 2017) and (b) no competition between a Barr generic Aggrenox product and *any other* generic Aggrenox product (including those sold by Boehringer and/or third parties) during Barr's 180-exclusivity period (from generic entry until January 2016).  This aspect of the Agreement provides substantial compensation—many millions of dollars—to Barr, which could expect to make approximately double the unit sales, at a much higher price, absent competition between Barr's ANDA generic and Boehringer's authorized generic in the market, particularly during the 180-day exclusivity period.  These higher prices come at the expense of BCBSLA and others.

79.     Boehringer's large payment to Barr via the exclusive supply and non-competition arrangement is unjustified and far exceeds the fair value of services (if any) provided by Barr.  Boehringer had no need to market its authorized generic Aggrenox

product through Barr. Boehringer has its own wholly-owned subsidiary, Roxane Laboratories, Inc., through which it has launched at least seven authorized generic versions of its brand name products, including before the Agreement with Barr. Absent Barr's agreement to delay generic entry, Boehringer would not have agreed to exclusively supply its authorized generic Aggrenox to its competitor Barr.   Instead, Boehringer would have launched its authorized generic in competition with Barr.   And absent payment from Boehringer, Barr would not have agreed to refrain from launching its ANDA product to market in competition with Boehringer's product.   As Boehringer itself has said: "parties engaged in contentious litigation would not otherwise be willing to do business with each other. . . ."

80.    Nor was the supply agreement an independent business transaction.  The face of the Agreement makes plain that the supply agreement, like the co-promotion agreement, was an integral part of the overall Agreement and consideration for Barr's agreement to drop its challenge to the '577 Patent and delay generic entry.

81.    Taken together, Boehringer's payments to Barr under the Agreement guaranteed two distinct periods of non-competition: (a) the period before generic competition, whereby Boehringer and Barr agreed to allocate 100% of the market to Boehringer; and (b) the period after generic competition, whereby Boehringer and Barr agreed not to sell competing generic versions of Aggrenox, with the intent to allocate 100% of the generic segment to Barr during the 180-day exclusivity period and reduce inter-generic competition for the duration of the patent term. Under the Agreement, there was no period of unrestrained competition between possible generic entry and the end of the patent term.

82.    Defendants have no procompetitive explanation or justification for the

23

payments.  The total payments flowing from Boehringer to Barr had a cash value far above $120 million dollars and had no explanation or justification other than to induce Barr to stay out of the Aggrenox market.  These large, unjustified payments had no rational connection to, and far exceeds, any approximation of the costs of continuing the patent litigation.  The payment was not consideration for the fair value of services provided from Barr to Boehringer.

D.    **Teva Acquires Barr and Continues the Unlawful Agreement to Suppress Generic Competition**

83.    The Agreement contemplated that Barr might be acquired by Teva and bound Teva to its terms in the event of such an acquisition.

84.    On December 23, 2008, Teva acquired Barr by merging the two corporations, Teva, as the surviving entity, assumed liability for the illegal conduct Barr engaged in before the merger and stepped into Barr's shoes with respect to the Exclusion Payment Agreement. Teva has continued to refrain from entering the market with a generic equivalent of Aggrenox.  Teva thus joined the ongoing unlawful course of conduct—and joined the unlawful agreements, collusion and conspiracy—to suppress generic competition of Aggrenox.  Teva did not withdraw from the conspiracy, and instead continued to participate in it.

85.    As a result of its merger with Barr, Teva would own (either directly or indirectly) ANDA 78-804 and the 180-day exclusivity period that Barr may be entitled to as the first filer.

86.    Post-acquisition, Teva/Barr continued to pursue approval of ANDA 78-804. On August 14, 2009 the FDA granted final approval of ANDA 78-804 for a generic equivalent of Aggrenox.  Because of the Exclusion Payment Agreement, no generic

equivalent of Aggrenox is on the market and none will be so until July 1, 2015.

**E.    The Unlawful Agreement to Suppress Generic Competition Is Ongoing and Continues to Cause Harm**

87.    Since the execution of the Agreement and continuing until today and beyond, Barr/Teva has continuously refused to enter the market with generic Aggrenox despite having FDA approval to do so, and Boehringer has continued to pay Barr/Teva for this delayed competition, including throughout the last four years.

88.    The lack of generic competition is the direct result of the ongoing unlawful Agreement that began in 2008, has continued since then, and will continue at least through July 1, 2015. Boehringer continues to sell brand name Aggrenox at artificially inflated prices, and BCBSLA has been denied the lower prices that generic competition would have brought to the market.  Moreover, even once a generic, bioequivalent version of Aggrenox enters the market, the Agreement will continue to harm BCBSLA by depriving it of the benefits of inter-generic competition.

89.    Since the Agreement, including during at least the four-year period prior to the filing of this complaint, Defendants' unlawful conduct was and continues to be ongoing and BCBSLA was injured, and continues to be injured, every day that the Defendants' unlawful agreement was and remains in place.

90.    But for the anticompetitive, illegal, and ongoing conduct alleged in this complaint, BCBSLA would have had access to less expensive versions of Aggrenox, and would have substituted its purchases of branded Aggrenox with generic Aggrenox, much sooner than it currently will.  The Defendants have injured BCBSLA by causing it to pay substantial overcharges – potentially hundreds of millions of dollars—each time it purchased Aggrenox at artificially inflated prices during at least the last four years and continuing even

today.

F.   **The Federal Trade Commission Opens an Investigation Into the Exclusion Payment Agreements**

91.   On January 15, 2009, the FTC issued a Resolution Authorizing Use of Compulsory Process in Nonpublic Investigation to determine "whether Boehringer Ingelheim Pharmaceuticals, Inc. and Barr Pharmaceuticals, Inc., and their affiliates, or any other person, has engaged or is engaging in unfair methods of competition . . . with respect to the sale of Aggrenox or its generic equivalents and Mirapex and its generic equivalents." FTC File No. 091-0023; see Federal Trade Commission v. Boehringer Ingelheim Pharmaceuticals, Inc., Case No. 1:09-mc-oo564-JMF, Dkt. # 1-1, at 3 (D.C.).  As the FTC explained, "[c]ompensation rarely takes the form of explicit cash payments; instead, the settling firms typically include the payment in a separate business deal executed simultaneously with the settlement."  Case No. 12-5393 (D.C. Cir.), Brief of Appellant Federal Trade Commission, Doc. #1444255, p. 9 ("FTC Brief").

92.   Pursuant to Sections 3 and 9 of the FTC Act, 15 U.S.C. §§ 43 and 49, on February 5, 2009 the FTC issued a subpoena to Boehringer seeking 37 categories of documents, including documents related to the settlements of the Aggrenox litigation and the Co-Promotion Agreement.   The FTC subpoena seeks—and Boehringer has refused to provide—its internal financial analysis regarding whether the payments Boehringer made to Barr under the Co-Promotion Agreement were for promotional services alone, or "side-payments for an anticompetitive agreement to delay generic entry and share the ensuing monopoly profits?"  FTC Brief, at p. 2.  Boehringer refused to produce documents that would substantiate its assertion that the Co-Promotion Agreement provided Boehringer with substantial value aside from the benefits it derived from delaying generic competition for

Aggrenox.

93.     In light of Boehringer's refusal to turn over the relevant documents in response to the FTC's subpoena, on October 23, 2009 the FTC filed a petition with the District Court for the District of Columbia to enforce the subpoena.  The FTC's petition did not specify the size of the payments from Boehringer to Barr under the Co-Promotion Agreement, and no other document filed publicly on the District Court docket contained this information.

94.     On December 12, 2012, after the District Court had determined that Boehringer's internal financial analyses regarding the Co-Promotion Agreement were privileged and in large part denied the FTC's petition, the agency filed a Notice of Appeal with the Court of Appeals for the District of Columbia.

95.     While Boehringer has not provided the FTC with its internal financial analyses, the FTC is in possession of the terms of the Co-Promotion Agreement.  Based on this information, the FTC described the payments under the Co-Promotion Agreement as a "significant financial transaction."  *Id.*, p. 36, n. 12.  In a June 28, 2013 brief before the circuit court, the FTC explained that:

> Under the agreement, Boehringer agreed to pay Barr a one-time fee plus annual, increasing royalties on the total U.S. Aggrenox sales for a period of years. . . .  In 2008, Aggrenox had total U.S. sales of about $366 million. . . .  At this level of sales, the FTC estimates that the deal would ultimately cost Boehringer over $120 million in royalties.

*Id.*  The litigation and the FTC's investigation are ongoing.

## VI.   MARKET POWER AND MARKET DEFINITION

96.     At all relevant times, Boehringer has had the power to maintain the price of Aggrenox at supracompetitive levels without losing substantial sales to other products.

27

97.     Aggrenox does not exhibit significant, positive cross-elasticity of demand with respect to price with any product other than an AB-rated generic equivalent of Aggrenox.

98.     Because of its unique profile as a combined aspirin and extended-release dipyridamole treatment for subsequent strokes, Aggrenox is differentiated from all products other than AB-rated generic equivalents of Aggrenox.   Aggrenox's specific ratio of dipyridamole to aspirin and the release formulations of those components also differentiate it from products aside from AB-rated generic equivalents.

99.     Boehringer needed to control only Aggrenox (and any AB-rated generic equivalents to Aggrenox), and no other products, to maintain the price of Aggrenox profitably at monopolistic prices.   Only the market entry of a competing AB-rated generic equivalent to Aggrenox would render Boehringer unable to profitably maintain monopoly prices of Aggrenox.

100.    Boehringer also sold branded Aggrenox at prices well in excess of marginal costs and the competitive price, and enjoyed high profit margins.

101.    The Defendants have had and continue to exercise the power to exclude generic competition to branded Aggrenox.

102.    At all relevant times, the Defendants enjoyed high barriers to entry with respect to the market for Aggrenox products.

103.    To the extent that BCBSLA is legally required to define a relevant product market. BCBSLA alleges that the relevant market is all Aggrenox products (*i.e.*, 25 mg aspirin/200 mg extended-release dipyridamole capsules), which includes Aggrenox and AB-rated bioequivalent products.

104.   Aggrenox is available only by doctor's prescription. The doctor's prescription defines the relevant product market, since a prescription for a prescription drug may be filled only with the brand name drug named in the prescription or its AB-rated, FDA-approved generic equivalent. So if a doctor prescribes "Aggrenox," the prescription may be filled only with brand Aggrenox until there is an AB-rated bioequivalent available.

105.   During the relevant time period, the Defendants have been able to profitably maintain the price of Aggrenox well above competitive levels.

106.   Without the power to exclude and restrict competition to 200 mg extended release dipyridamole I 25 mg acetylsalicylic acid capsules (Aggrenox and AB-rated bioequivalent generics), and ability to sell its own branded version of that drug, Aggrenox, at prices well over marginal costs, it would not have been economically rational for Boehringer to pay Barr up to $120 million to delay Barr's launch of its AB-rated generic Aggrenox.

107.   The relevant geographic market is the United States and its territories.

108.   At all relevant times, Boehringer has had a 100% market share in the relevant market, and will continue to have that market share until as late as July 2015.

VII.   **MARKET EFFECTS**

109.   Boehringer began marketing Aggrenox in December 1999.  But, as a result of the Agreement, no generic equivalent of Aggrenox has ever been available for purchase in the United States.

110.   Defendants' unlawful Exclusion Payment Agreement was designed to and did in fact: (a) preclude the entry of less expensive generic versions of Aggrenox products in the United States and its territories; (b) fix, raise, maintain or stabilize the price of 25 mg aspirin/200 mg extended-release dipyridamole capsules; and (c) allocate 100% of the United

29

States and its territories 25 mg aspirin/200 mg extended-release dipyridamole capsules market to Boehringer.  Moreover, once generic Aggrenox entry finally occurs, Defendants' Agreement is designed to and will allocate 100% of the generic segment to Barr during the 180-day exclusivity period and reduce inter-generic competition for the remainder of the 577 Patent's term.

111.    Barr's generic Aggrenox ANDA received final FDA approval on August 14, 2009.  But for the unlawful Exclusion Payment Agreement, Barr would have entered the market as early as August 11, 2008, or at the latest by November 30, 2009 through: (a) an "at risk" launch upon receiving final FDA approval following the expiration of the 30-month stay; (b) earlier licensed entry via a lawful  agreement with Boehringer that did not include unlawful payments to Barr; or (c) by winning the '577 Patent litigation.

112.    It is well-known in the industry that due to its substantial resources Teva has a long history of "at risk" launches, including thirteen such launches between 2004 and 2008 alone.  Many of Teva's "at risk" launches involved products with annual sales less than $500 million. It is also well-known in the industry that "at risk" launches are particularly likely when, like here, a company with a history of "at risk" launches is the first-filing generic.

113.    Absent an "at risk" launch, but for the large unjustified payments Boehringer made to Barr in exchange for Barr's agreement to delay launching generic Aggrenox, Defendants would have agreed to an unrestrained licensed entry date significantly earlier than July 1, 2015.  Without the payments, which were the quid pro quo for the delay (and absent an at risk launch or litigation victory), Barr would have insisted on and received earlier, unrestrained licensed entry.

114.    In addition, but for the Agreement, Boehringer, as a rational economic actor

seeking to recoup lost branded sales, would have launched an authorized, bioequivalent generic version of Aggrenox simultaneously with the launch of Barr's bioequivalent generic version of Aggrenox, as it has done numerous times, pushing generic prices lower. Indeed, Boehringer, through its wholly-owned subsidiary Roxane Laboratories, Inc., has launched authorized generic versions of at least seven of its brand drug products, including before the Agreement. Boehringer's launch of authorized generic products through Roxane include, but are not limited to: Atrovent, Metaprel, Micardis, Micardis HCT, Mobic, Persantine, and Viramune.

115.    But for the Defendants' illegal conduct, generic competition would have forced a decrease in the price of branded Aggrenox, and price competition among the suppliers of branded and generic Aggrenox would have been intense.

116.    But for the Defendants' illegal conduct, BCBSLA would have paid less for Aggrenox or a generic equivalent.  The Defendants' conduct directly injured BCBSLA because it forced BCBSLA to pay millions of dollars in overcharges on its Aggrenox purchases and will force BCBSLA to pay artificially inflated prices for generic Aggrenox as a result of the non-competition agreement between Boehringer and Barr.

117.    As a result of the delay in generic competition brought about by the Defendants' anticompetitive scheme, BCBSLA paid more for Aggrenox products than they would have paid absent the Defendants' illegal conduct.

118.    Barr had, and Teva has, extensive experience in the pharmaceutical industry, including experience obtaining approval of ANDAs, manufacturing commercial launch quantities adequate to meet market demand, and marketing generic pharmaceutical products.

119.    Upon entering the market, generic equivalents of brand name drugs are priced

significantly below the branded drug to which they are AB-rated.  When multiple generic products are on the market, prices for the brand drug and its generic equivalents fall even further because of the increased competition.

120.   If generic competition for Aggrenox had not been unlawfully delayed, BCBSLA would have paid less for Aggrenox by substituting purchases of less-expensive AB-rated generic equivalents of Aggrenox for its purchases of more-expensive brand Aggrenox.

121.   Thus, the Defendants' unlawful conduct deprived BCBSLA of the benefits of competition that the antitrust laws were designed to ensure.  The unlawful agreement also discouraged other generic companies from seeking to come to market.  As the "first filer" of an ANDA, Barr is eligible to obtain 180 days of market exclusivity which would only begin to run once it came to market. Only after the 180 day market exclusivity expired could other generic companies, obtain FDA final approval to manufacture, market and sell a bioequivalent version of Aggrenox in order to come to market.

## VIII.   ANTITRUST IMPACT AND INJURY

122.   During the Relevant Period, BCBSLA indirectly purchased, paid for, and/or provided reimbursements in excess of $5 million for Aggrenox from Boehringer.  As a result of the Defendants' illegal conduct, BCBSLA was compelled to pay artificially inflated prices for Aggrenox.  Those prices were substantially higher than the prices that BCBSLA would have paid absent the illegal conduct alleged in this complaint.

123.   As a consequence, BCBSLA has sustained substantial losses and damage to its business and property in the form of overcharges.   The full amount, forms, and components of such damages will be calculated after discovery and upon proof at trial.

124.   Defendants' efforts to restrain competition in the market for Aggrenox have substantially affected interstate and foreign commerce.

125.   At all material times, Boehringer manufactured, promoted, distributed, and sold substantial amounts of Aggrenox in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

126.   Defendants' anticompetitive conduct had substantial intrastate effects in every state of purchase in that, among other things, retailers within each state were foreclosed from offering less expensive generic, bioequivalent versions of Aggrenox to purchasers within each state. During the Relevant Period, this directly impacted and disrupted interstate and intrastate commerce for consumers and third-party payors, such as BCBSLA, within each state, including the thirty specifically enumerated states in which BCBSLA made purchases and/or reimbursements during the relevant period.

127.   At all material times, Defendants transmitted funds and contracts, invoices, and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of Aggrenox.

128.   General economic theory recognizes that any overcharge at a higher level of distribution generally results in higher prices at every level below.  *See* Hovenkamp, *Federal Antitrust Policy: The Law of Competition and Its Practice* (1994) at 624.   Professor Hovenkamp explains that "[e]very person at every stage in the chain will be poorer" as a result of the anticompetitive price at the top.   He also says that "[t]heoretically, one can calculate the percentage of any overcharge that a firm at one distribution level will pass on to those at the next level."

129.    The institutional structure of pricing and regulation in the pharmaceutical drug industry ensures that overcharges at the higher level of distribution are passed on to end-payors. Wholesalers and retailers passed on the inflated prices of Aggrenox to BCBSLA.

130.    Defendants' anticompetitive conduct enabled Boehringer to indirectly charge consumers and third-party payors prices in excess of what they otherwise would have been able to charge absent the Defendants' unlawful actions.

131.    The prices were inflated as a direct and foreseeable result of Defendants' anticompetitive conduct.

132.    The inflated prices that BCBSLA has paid are traceable to, and the foreseeable result of, the overcharges by Boehringer.

## IX.    FRAUDULENT CONCEALMENT TOLLED THE STATUTE OF LIMITATIONS

133.    BCBSLA had no knowledge of the Defendants' unlawful self-concealing scheme and could not have discovered the scheme and conspiracy through the exercise of reasonable diligence more than four years prior to the filing of this complaint.

134.    This is true because the nature of Defendants' conspiracy was self-concealing and because the Defendants employed practices and techniques of secrecy to avoid detection of, and to fraudulently conceal their contract, combination, conspiracy, and scheme. Notwithstanding the self-concealing nature of their conspiracy, Defendants and their co-conspirators wrongfully and affirmatively concealed the existence of their continuing combination and conspiracy from BCBSLA by, among other things:

   a.    Requiring material provisions of the Agreement to be kept confidential under terms of the Agreement;

   b.    Concealing the amounts that Boehringer was to pay and paid Barr/Teva under the Exclusion Payment Agreement and concealing that the payments were for the purpose of delaying the entry of lower-priced generics;

c.    Concealing the fact that the purpose of the payments under the Co-Promotion Agreement was to provide compensation to Barr/Teva in connection with the settlement of the '577 Patent litigation and the entry date for Barr/Teva's generic product;

d.    Concealing the fact that those amounts far exceeded any lawful economic benefit that Boehringer received from Barr/Teva under the agreement; and

e.    Filing documents with the SEC that failed to disclose the existence or nature of the Exclusion Payment Agreement.  Teva's fiscal year 2008 20-F did not mention the settlement of the Aggrenox litigation. The 20-F also mentioned a co-promotion agreement for a different pharmaceutical product, but did not mention the Aggrenox Co-Promotion Agreement.  Teva's 20-F filings for the fiscal years 2009, 2010, 2011, and 2012 similarly failed to disclose the Aggrenox settlement or the Co-Promotion Agreement.

135.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, BCBSLA had no knowledge of the conspiracy more than any applicable statute of limitations period, including at least four years prior to the filing of this complaint, or of the facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.

136.    BCBSLA also lacked the facts and information necessary to form a good faith basis for believing that any legal violations had occurred, including the amounts of payments made from Boehringer to Barr/Teva under the Co-Promotion Agreement.  Reasonable diligence on the part of BCBSLA would not have uncovered those facts more than any applicable statute of limitations period, including at least four years prior to the filing of this complaint.

137.    As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting BCBSLA's claims have been tolled.

138.    Alternatively, any applicable statute of limitations is not tolled, this Complaint alleges a continuing course of conduct (including conduct within the limitations period), and

BCBSLA can recover damages they suffered during the limitations period.

## X.    CONTINUING VIOLATIONS

139.    This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and Defendants' unlawful conduct has included continuing and accumulating harm within the applicable statutes of limitations. Thus, BCBSLA can recover damages they suffered during the applicable limitations periods.

140.    The most obvious continuing violation is Defendants' charging of supracompetitive prices to BCBSLA within the limitations periods. Every time BCBSLA was overcharged for branded Aggrenox, they suffered a cognizable injury.  In addition to inflicting overcharges, Defendants committed additional overt acts constituting continuing violations, including without limitation:

   a.   *Teva/Barr's continuous refusal to enter the market.* Teva/Barr has continually adhered to the Exclusion Payment Agreement by refusing to launch generic Aggrenox before July 1, 2015. This continuous refusal to enter the market constitutes an ongoing series of overt acts that continually re-set the statute of limitations.

   b.   *Boehringer's refraining from launching a competing generic.* Similar to Teva/Barr's refusal to enter the market is Boehringer's refraining from launching a competing generic. This refusal to enter with a competing generic results in BCBSLA incurring additional overcharges.

   c.   *Boehringer's continuing payments under the Co-Promotion Agreement.* Each payment to Teva/Barr pursuant to the Co-Promotion Agreement constitutes an overt act justifying the application of the continuing violation doctrine. These payments, which occur quarterly, are based on annual increasing royalties on the total U.S. Aggrenox sales through July 1, 2015.

141.    As  co-conspirators,  Defendants  share  responsibility  for  each  of these continuing violations.

## XI.   CLAIMS FOR RELIEF

### COUNT ONE

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT
### (Against All Defendants)

142.   BCBSLA incorporates the preceding paragraphs by reference.

143.   The defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to delay and block entry of AB-rated generic equivalents of Aggrenox.  The intended and accomplished goal of the scheme was to use restrictive and exclusionary conduct to delay Barr and Teva's launch date for the first generic equivalent of Aggrenox.  The defendants injured BCBSLA through an agreement to exclude generic Aggrenox products from the market in exchange for substantial payments to Barr and Teva.

144.   Had manufacturers of generic Aggrenox products entered the market and lawfully competed with Boehringer in a timely fashion, BCBSLA would have substituted lower-priced generic Aggrenox products for the higher-priced brand name Aggrenox for some or all of its purchases.

145.   The defendants intended, and accomplished, a horizontal market allocation of the Aggrenox market.  By their agreement, the defendants intentionally and wrongfully conspired and combined in an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.  As a result of this unreasonable restraint on competition, BCBSLA paid artificially inflated prices for Aggrenox.

146.   BCBSLA has suffered harm, and will continue to suffer harm in the future. BCBSLA also faces a continuing threat of injury from the unlawful conduct alleged in this complaint.

147.   BCBSLA has indirectly purchased and/or reimbursed for substantial amounts of Aggrenox from Boehringer.

148.   As a successor in interest to Barr, Teva is liable for all of Barr's anticompetitive conduct in connection with Aggrenox.  And by joining an ongoing unlawful agreement to restrain trade, Teva is liable for all conduct that occurred prior to the date on which it joined the ongoing unlawful course of conduct.  In addition, Teva is liable for its own unlawful conduct.

149.   BCBSLA seeks a declaratory judgment pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) that the defendants' conduct violates Section 1 and 2 of the Sherman Act.

150.   BCBSLA also seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by the defendants' unlawful conduct, and other relief to ensure that similar anticompetitive conduct does not reoccur in the future.

## COUNT TWO

### CONSPIRACY AND COMBINATION
### IN RESTRAINT OF TRADE UNDER STATE LAW
**(Against All Defendants)**

151.   BCBSLA incorporates the preceding paragraphs by reference.

152.   On or about August 11, 2008, Boehringer and Barr entered into the Exclusion Payment Agreement to suppress generic competition with Aggrenox.  Teva joined and continued the unlawful agreement to suppress generic competition.  The Exclusion Payment Agreement was and is a contract, combination, and/or conspiracy that substantially, unreasonably, and unduly restrained trade or commerce, the purpose and effect of which was

to:

     a.     Allocate all sales of Aggrenox in the United States to Boehringer until as late as July 1, 2015;

     b.     Prevent Barr from selling a generic equivalent of Aggrenox in the United States until as late as July 1, 2015;

     c.     Prevent Boehringer from competing against Barr/Teva with an authorized generic version of Aggrenox once Barr/Teva launch on July 1, 2015;

     d.     Fix, raise, maintain or stabilize the price that BCBSLA paid for Aggrenox and its AB-rated equivalents at supracompetitive levels; and

     e.     Fix, raise, maintain or stabilize the price that BCBSLA will pay for generic Aggrenox at supra-competitive levels.

     f.     The Exclusion Payment Agreement has harmed BCBSLA as set forth above.

     g.     The Exclusion Payment Agreement has covered a sufficiently substantial percentage of the relevant market to harm competition.

     h.     The Exclusion Payment Agreement is a horizontal market allocation and price-fixing agreement between actual and potential competitors that constitutes an illegal restraint of trade or commerce.

153.    The Exclusion Payment Agreement has harmed and continues to harm BCBSLA.

154.    There is and was no legitimate, non-pretextual, pro-competitive business justification for the exclusion payments made by Boehringer to Barr that outweighs their harmful effect. Even if there were such a justification, payments were not necessary to achieve any conceivable pro-competitive purpose, nor were they the least restrictive means of achieving any such purported justification.

155.    By engaging in the anticompetitive conduct alleged herein, Defendants have intentionally and unlawfully engaged in one or more combinations and/or conspiracies in restraint of trade in violation of the following state laws:

a.  Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1402, *et seq*., with respect to purchases of and/or reimbursements for Aggrenox in Arizona by BCBSLA.

b.  Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Cal. Bus. & Prof. Code §§ 16720, *et seq*., and Code §§ 17200, *et seq*., with respect to purchases of and/or reimbursements for Aggrenox in California by BCBSLA.

c.  Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of 740 Ill. Comp. Stat. 10/3, *et seq*., with respect to purchases of and/or reimbursements for Aggrenox in Illinois by BCBSLA.

d.  Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Kan. Stat. Ann. §§ 50-101, *et seq*., with respect to purchases of and/or reimbursements for Aggrenox in Kansas by BCBSLA.

e.  Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of La. Rev. Stat. §51:121, *et seq*., with respect to purchases of and/or reimbursements for Aggrenox in Louisiana by BCBSLA. Pursuant to La. R.S. §§51:136-138 and related statutes, Defendants are liable to the State for (treble) damages, restitution, as well as attorney fees and costs.

f.  Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq*., with respect to purchases of and/or reimbursements for Aggrenox in Maine by BCBSLA.

g.  Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Mich. Comp. Laws Ann. §§ 445.771, *et seq*., with respect to purchases of and/or reimbursements for Aggrenox in Michigan by BCBSLA.

h.  Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Minn. Stat. §§ 325D.51, *et seq*., with respect to purchases of and/or reimbursements for Aggrenox in Minnesota by BCBSLA.

i.  Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Miss. Code Ann. §§ 75-21-1, *et seq*., with respect to purchases of and/or reimbursements for Aggrenox in Mississippi by BCBSLA.

j.      Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of N.Y. Gen. Bus. Law §§ 340, *et seq.*, with respect to purchases of and/or reimbursements for Aggrenox in New York by BCBSLA.

k.      Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases of and/or reimbursements for Aggrenox in North Carolina by BCBSLA.

l.      Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Or. Rev. Stat. §§ 646.725, *et seq.*, with respect to purchases of and/or reimbursements for Aggrenox in Oregon by BCBSLA.

m.      Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of R.I. Gen. Laws §§ 6-36-4, *et seq.*, with respect to purchases of Aggrenox in Rhode Island by BCBSLA.

n.      Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases of and/or reimbursements for Aggrenox in Tennessee by BCBSLA, in that the actions and transactions alleged herein substantially affected Tennessee, with thousands of end-payors in Tennessee, including BCBSLA, being forced to purchase a more expensive branded Aggrenox product.

156.    BCBSLA has been injured in its business or property as a direct and proximate result by Defendants' anticompetitive conduct. Its injuries consist of: (1) being denied the opportunity to purchase and/or reimburse for lower-priced generic Aggrenox products, and (2) being forced to purchase and/or reimburse for a more expensive branded Aggrenox product. These injuries are of the type the above antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

157.    As a successor in interest to Barr, Teva is liable for all of Barr's anticompetitive conduct in connection with Aggrenox. And by joining an ongoing unlawful agreement to restrain trade, Teva is liable for all conduct that occurred prior to the date on which it joined the ongoing unlawful course of conduct. In addition, Teva is liable for its

own unlawful conduct.

158.    BCBSLA seeks damages and multiple damages as permitted by law for the injuries it suffered as a result of the Defendants' anticompetitive conduct.

159.    Defendants are jointly and severally liable for all damages suffered by BCBSLA.

160.    Defendants have engaged in unfair competition or unfair acts or practices in violation of the above-listed state antitrust laws.

## COUNT THREE

### CONSPIRACY AND MONOPOLIZATION UNDER STATE LAW
### (Against all Defendants)

161.    BCBSLA incorporates the preceding paragraphs by reference.

162.    At all relevant times, Boehringer possessed monopoly power in the relevant market.

163.    Boehringer entered into an illegal agreement (reverse payment settlement agreement) with Barr, as part of an overall scheme, to settle a patent infringement suit in order to maintain its monopoly power in the market for Aggrenox as described herein.

164.    The goal, purpose and effect of the illegal agreement were for Boehringer to maintain and extend its monopoly power in the Aggrenox market.

165.    BCBSLA indirectly purchased and/or reimbursed for substantial amounts of Aggrenox from Boehringer.

166.    Had manufacturers of generic Aggrenox entered the market and lawfully competed in a timely fashion, BCBSLA would have substituted lower-priced generic Aggrenox for the higher priced branded version for some or all of its Aggrenox requirements, and/or would have paid lower net prices on its remaining Aggrenox purchases.

42

167.    Defendants each committed at least one overt act in furtherance of the conspiracy.

168.    As a result of Defendants' illegal concerted conduct, BCBSLA was forced to pay, and did pay, more than they would have paid for Aggrenox or a generic equivalent.

169.    By engaging in the foregoing misconduct, Boehringer has violated the following state antitrust laws:

a.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Ariz. Rev. Stat. §§ 44-1402, *et seq.*, with respect to purchases of and/or reimbursements for Aggrenox in Arizona by BCBSLA.

b.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Cal. Bus. & Prof. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases of and/or reimbursements for Aggrenox in California by BCBSLA.

c.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of 740 Ill. Comp. Stat. 10/3, *et seq.*, with respect to purchases of and/or reimbursements for Aggrenox in Illinois by BCBSLA.

d.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases of and/or reimbursements for Aggrenox in Kansas by BCBSLA.

e.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of La. Rev. Stat. §51:121, *et seq.*, with respect to purchases of and/or reimbursements for Aggrenox in Louisiana by BCBSLA. Pursuant to La. R.S. §§51:136-138 and related statutes, Defendants are liable to the State for (treble) damages, restitution, as well as attorney fees and costs.

f.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.*, with respect to purchases of and/or reimbursements for Aggrenox in Louisiana by BCBSLA.

g.    Defendants have intentionally and unlawfully engaged in a conspiracy

43

to monopolize the relevant market in violation of Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases of and/or reimbursements for Aggrenox in Michigan by BCBSLA.

h.     Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Minn. Stat. §§ 325D.52, *et seq.*, with respect to purchases of and/or reimbursements for Aggrenox in Minnesota by BCBSLA.

i.     Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases of and/or reimbursements for Aggrenox in Mississippi by BCBSLA.

j.     Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of N.C. Gen. Stat. §§ 75-2.1, *et seq.*, with respect to purchases of and/or reimbursements for Aggrenox in North Carolina by BCBSLA.

170.    BCBSLA has been and continues to be injured in its business or property by reason of Boehringer's antitrust violations alleged herein. This injury consists of being forced to purchase a more expensive branded Aggrenox product. This injury is of the type the antitrust and consumer protection laws of the above States were designed to prevent, and flows from that which makes Boehringer's conduct unlawful.

## COUNT FOUR

## VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### (Against all Defendants)

171.    BCBSLA adopts the preceding paragraphs by reference.

172.    BCBSLA has purchased and/or reimbursed for Aggrenox in Florida since November 2008, and continues through the present.

173.    The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. Ann. §501.204, prohibits unfair methods of competition and unfair acts or practices in the conduct of any trade or commerce.

174.    An "unfair practice," within the meaning of FDUTPA is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

175.    By their conduct described herein in violation of antitrust laws, Defendants have engaged in unfair competition or unfair or deceptive acts or practices while conducting trade or commerce in violation of FDUTPA, with respect to BCBSLA's purchases of and/or reimbursements for 200 mg extended-release dipyridamole I 25 mg acetylsalicylic acid capsules in Florida, since April 28, 2010.

176.    As a direct and proximate result of this conduct in violation of FDUTPA, BCBSLA has been injured and will continue to be injured by being forced to pay higher prices for brand name Aggrenox, and eventually generic Aggrenox, than it would have paid if Defendants had not illegally delayed generic competition in violation of FDUTPA.

177.    Defendants are jointly and severally liable for all injuries suffered by BCBSLA.

178.    BCBSLA seeks damages, plus attorney's fees and costs, as permitted by law for the injuries it suffered because of the Defendants' violation of FDUTPA, and permanent injunctive relief to terminate Defendants' anticompetitive practices alleged in this Complaint.

## COUNT FIVE

### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
#### (Against All Defendants)

179.    BCBSLA adopts the preceding paragraphs by reference.

180.    The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, et seq., prohibits unfair methods of competition and unfair acts or

practices. Further, the Illinois Consumer Fraud and Deceptive Business Practices Act gives express consideration to interpretations of the FTC relating to Section 5 of the Federal Trade Commission Act.

181.    Defendants engaged in unfair business practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act by using unfair business practices to enter into an unlawful "reverse payment agreement" through which Boehringer paid Barr more than $120 million in cash and other valuable consideration in exchange for Barr's agreement not to launch a less expensive, bio-equivalent generic version of Aggrenox for up to seven years.

182.    As direct and proximate result of Defendants unlawful market allocation agreement, no bio-equivalent generic version of Aggrenox is presently on the market and no generic will come to market until July 2015. This unfair and unlawful agreement not to compete has prevented less expensive generic versions of Aggrenox from entering the market, causing BCBSLA to pay overcharges in Illinois.

183.    Defendants' acts constitute an unfair trade practice in that: a) the practice offends public policy as established by statutes, the common law or otherwise and is within at least the penumbra of some common law, statutory or other established concept of unfairness; b) the practice is immoral, unethical, oppressive, or unscrupulous; and 3) the practice causes substantial injury to consumers, competitors or other businesses, including BCBLA.

184.    The actions and transactions constituting Defendants' unfair acts and practices occurred primarily and substantially in Illinois under the pragmatic, functional analysis employed by courts in that a) although Defendants committed many of the acts, omissions

and conduct detailed herein outside of Illinois, Defendants' unlawful conduct did not terminate at the borders of other states, but were intended to and did impact BCBSLA in and throughout Illinois; b) BCBSLA made purchases and/or reimbursements in Illinois, the location of the impact of Defendants' unfair acts or practices; c) BCBSLA incurred losses and suffered damages within Illinois.

185.    As a direct and proximate result Defendants' unfair and unlawful practices, BCBSLA has suffered and will continue to suffer injury and losses of money and property and are entitled to damages in an amount to be proven at trial, reasonable attorneys' fees and costs, and such equitable relief, including an injunction, as the Court deems to be necessary and proper.

## COUNT SIX

## VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES ACT
### (Against All Defendants)

186.    BCBSLA adopts the preceding paragraphs by reference.

187.    Defendants have engaged in unfair competition and/or unfair or deceptive acts or practices in violation of La. Rev. Stat. §51:1401, *et seq.* ("LUTPA").

188.    BCBSLA has been injured by reason of Defendants' anticompetitive, unfair, or deceptive acts as alleged herein. BCBSLA's injury consists of paying higher prices for Aggrenox in Louisiana than it would have paid in the absence of these violations. This injury of the type the LUTPA statutes were designed to prevent, and directly results from Defendants' unlawful conduct.

189.    Pursuant to La. Rev. Stat. §§51:1405-1414 and related statutes, Defendants are liable to BCBSLA for restitution, in an amount to be determined at trial, and treble damages, arising out of Defendants' anticompetitive, deceptive and unfair methods, acts and

trade practices, as well as reasonable attorney fees and costs.

## COUNT SEVEN

## VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION ACT
### (Against All Defendants)

190.     BCBSLA adopts the preceding paragraphs by reference.

191.     BCBSLA has purchased and/or reimbursed for Aggrenox in Massachusetts since November 2008, and continues to through the present.

192.     The Massachusetts Consumer Protection Act, Mass. Gen. Laws. Ch. 93A, *et seq.*, ("MCPA") makes it unlawful to engage in any "[u]nfair methods of competition or deceptive acts or practices in the conduct of any trade or commerce."

193.     Defendants violated the Massachusetts Consumer Protection Act Ch. 93A §§ 2, 9 and 11 by using unfair business practices to enter into an unlawful "reverse payment agreement" through which Boehringer paid Barr more than $120 million in cash and other valuable consideration in exchange for Barr's agreement not to launch a less expensive, bio-equivalent generic version of Aggrenox for up to seven years.

194.     As direct and proximate result of Defendants unlawful market allocation agreement, no bio-equivalent generic version of Aggrenox is presently on the market and no generic will come to market until July 2015. This unfair and unlawful agreement not to compete has prevented less expensive generic versions of Aggrenox from entering the market, causing BCBSLA to pay overcharges in Massachusetts.

195.     As a direct and proximate result Defendants' unfair and unlawful practices, BCBSLA has suffered and will continue to suffer injury and losses of money and property and are entitled to damages in an amount to be proven at trial, reasonable attorneys' fees and costs, and such equitable relief, including an injunction, as the Court deems to be necessary

and proper.

196.    Defendants are jointly and severally liable for all injuries suffered by BCBSLA.

## COUNT EIGHT

## CONSUMER PROTECTION AND UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW
### (Against all Defendants)

197.    BCBSLA incorporates the preceding paragraphs by reference.

198.    Defendants engaged in unfair competition or unfair acts or practices in violation of the state consumer protection statutes listed below.

199.    There was a gross disparity between the price that BCBSLA paid for the brand product and the value received, given that a less expensive substitute generic product should have been available.

200.    As a direct and proximate result of Defendants' unfair competition or unfair acts or practices in violation of the state consumer protection statutes listed below, BCBSLA was deprived of the opportunity to purchase a generic version of Aggrenox and forced to pay higher prices.

201.    By engaging in the foregoing conduct, Defendants have violated the following additional state unfair trade practices and consumer fraud laws:

    a.    Defendants have engaged in unfair competition or unfair acts or practices in violation of Alaska Stat. §§45.50.471, *et seq.*

    b.    Defendants have engaged in unfair competition or unfair acts or practices in violation of Ariz. Rev. Stat. §§44-1522, *et seq.*

    c.    Defendants have engaged in unfair competition or unfair acts or practices in violation of Ark. Code §§4-88-101, *et seq.*

    d.    Defendants have engaged in unfair competition or unfair acts or

practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*

e.      Defendants have engaged in unfair competition or unfair acts or practices in violation of Colo. Rev. Stat. §§6-1-105, *et seq.*

f.      Defendants have engaged in unfair competition or unfair acts or practices in violation of 5 Me. Rev. Stat. §§207, *et seq.*

g.      Defendants have engaged in unfair competition or unfair acts or practices in violation of Mich. Stat. §§445.901, *et seq.*

h.      Defendants have engaged in unfair competition or unfair acts or practices in violation of Minn. Stat. §§325D.43, *et seq.*, Minn. Stat. §§325F, *et seq.*, and Minn. Stat. 8.31, *et seq.*

i.      Defendants have engaged in unfair competition or unfair acts or practices in violation of Miss. Code. Ann. §§75-24-1, *et seq.*

j.      Defendants have engaged in unfair competition or unfair acts or practices in violation of Vernon's Missouri Stat. §§407.010, *et seq.*

k.      Defendants have engaged in unfair competition or unfair acts or practices in violation of N.Y. Gen. Bus. Law §§349, *et seq.*

l.      Defendants have engaged in unfair competition or unfair acts or practices in violation of N.C. Gen. Stat. §§75-1.1, *et seq.*

m.      Defendants have engaged in unfair competition or unfair acts or practices in violation of Or. Rev. Stat. §§646.605, *et seq.*

n.      Defendants have engaged in unfair competition or unfair acts or practices in violation of 73 Pa. Stat. §§201-1, *et seq.*

o.      Defendants have engaged in unfair competition or unfair acts or practices in violation of Va. Code Ann. §§59.1-196, *et seq.*

202.    BCBSLA has purchased and/or reimbursed for Aggrenox in each of these jurisdictions.

203.    BCBSLA has been injured in its business and property by reason of Defendants' anticompetitive, unfair or unconscionable acts alleged herein.   This injury consists of being forced to purchase a more expensive branded Aggrenox product. This

injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct.

## COUNT NINE

### RESTITUTION FOR UNJUST ENRICHMENT
#### (Against all Defendants)

204.    BCBSLA incorporates the preceding paragraphs by reference.

205.    To the extent required, this claim is pled in the alternative to the other claims under Federal Rule of Civil Procedure 8(d).

206.    Defendants have improperly benefited from the revenue and profits they have generated from Aggrenox sales made as a result of the acts alleged in this Complaint.

207.    Boehringer has benefitted from the acts alleged in this Complaint by virtue of maintaining a monopoly over Aggrenox and its AB-rated generic equivalents, and charging monopoly prices for Aggrenox, far beyond the time at which lawful generic competition would have otherwise begun.

208.    Barr and Teva have benefitted from the acts alleged in this Complaint in that they have received, and continue to receive monies (approximately $120 million) from Boehringer pursuant to the Exclusion Payment Agreements.

209.    BCBSLA has conferred an economic benefit upon the Defendants in the form of overpayments made for Aggrenox during the Relevant Period, to the detriment of BCBSLA.

210.    The economic benefit of (over)payments made by BCBSLA is a direct and proximate result of Defendants' anticompetitive behavior restricting competition as alleged above.

211.    The benefit held by the Defendants rightfully belongs to BCBSLA. BCBSLA

only made these overpayments as a result of Defendants' conduct during the Relevant Period to prevent generic entry into the market.

212.   It would be inequitable for Defendants to retain any of the economic benefits derived from the conduct alleged herein. In particular, it would be inequitable for Defendants Barr and Teva to retain any of the proceeds from the Exclusion Payment Agreements; and it would inequitable for the Boehringer Defendants to retain any of the revenue derived from the preservation of its monopoly over Aggrenox and its AB-rated generic equivalents.

213.   It would be futile for BCBSLA to seek a remedy from any party with whom it had or has no privity of contract. Defendants paid no consideration to anyone for any of the illicit and inequitable benefits they received from BCBSLA, except to each other.

214.   Defendants are aware of and appreciate the benefits they obtained inequitably from BCBSLA.

215.   Defendants should be compelled to disgorge all proceeds they obtained inequitably as a result of the conduct alleged herein in a common fund for the benefit of BCBSLA.

216.   A constructive trust should be imposed upon all sums that the Defendants inequitably obtained that are traceable to BCBSLA.

217.   BCBSLA has no adequate remedy at law.

## XII.   **DEMAND FOR JUDGMENT**

WHEREFORE, BCBSLA demands a judgment that:

A. Declares that Defendants' conduct violated Sections 1 and 2 of the Sherman Act, the other statutes set forth above, and the common law of unjust enrichment;

B. Enjoins Defendants from continuing their illegal activities;

C. Enters joint and several judgments against Defendants and in favor of BCBSLA;

D. Grants BCBSLA equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy the Defendants' unjust enrichment;

E. Awards BCBSLA damages and, where applicable, treble, multiple, punitive, and other damages, in an amount to be determined at trial, including interest;

F. Awards BCBSLA its costs of suit, including reasonable attorneys' fees as provided by law; and

G. Grants further relief as necessary to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, as the Court deems just.

## XIII.   <u>JURY DEMAND</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, BCBSLA demands a trial by jury on all issues so triable.

Dated:  June 23, 2015

By:

*/s/ David L. Belt*
David L. Belt CT04274
Meaghan M. Ehrhard CT29793
HURWITZ SAGARIN SLOSSBERG & KNUFF
LLC
147 North Broad Street
P.O. Box 112
Milford, Connecticut 06460
Telephone: (203) 877-8000
Facsimile:  (203) 877-9800
dbelt@hssklaw.com
mehrhard@hssklaw.com

SALIM-BEASLEY LLC
Robert L. Salim (La. Bar 11663)
Barrett Beasley (La. Bar 25984)
1901 Texas Street
Natchitoches, LA 71457
Telephone: (318) 352-5999
Facsimile: (318) 352-5998
robertsalim@cp-tel.met


T. TAYLOR TOWNSEND, LLC
Thomas T. Townsend (La. Bar 20021)
320 St. Denis St.
P.O. Box 784
Natchitoches, LA  71458-0784
Telephone: (318) 238-3612
Facsimile:  (318) 238-6103
taylor@taylortownsendlaw.com


YOUNG COTTER & MEADE LLC
John Alden Meade (La. Bar. 29975)
909 Poydras St., Suite 1600
New Orleans, LA  70112
Telephone: (504) 799-3102
Facsimile: (504) 717-2846
jameade@meadelawllc.com